SMITH, LANDERYOU & COMPANY et al., Appellants, v. A. E. HOLLINGS-WORTH, Appellee, Cross-appellant; METCALF, COWGILL & COMPANY et al., Cross-appellants.

No. 41919.

DECEMBER 12, 1933.

REHEARING DENIED OCTOBER 25, 1934.

Stipp, Perry, Bannister & Starzinger and Donald D. Holdoegel, and Bowersock, Fizzell & Rhodes, for appellants.

Carr, Cox, Evans & Riley, for appellee and cross-appellant Hollingsworth.

Brunk, Bennett, Hassett & Janss and William L. Hassett, for cross-appellants Metcalf, Cowgill & Co. and others.

DONEGAN, J.—At the time the transactions involved in this case began, and until September 4, 1928, Metcalf, Cowgill & Co. was a

partnership with its principal place of business at Des Moines, Iowa. On September 4, 1928, the corporation, Metcalf, Cowgill & Co., Inc., was organized and became the successor to Metcalf, Cowgill & Co., the partnership. At all of the times herein involved, Smith, Landeryou & Co. was a partnership with its principal place of business at Omaha, Nebraska; W. D. Hanna & Co. was a corporation with its principal place of business at Burlington, Iowa; and Fidelity National Company was a corporation with its principal place of business at Kansas City, Missouri. It is undisputed that the partnership Metcalf, Cowgill & Co. included Donald J. Metcalf and Elvyn S. Cowgill as partners, and it is claimed by the plaintiffs-appellants herein that A. E. Hollingsworth was also a partner in the said firm of Metcalf, Cowgill & Co. This claim of the plaintiffs-appellants is denied by Hollingsworth and also by both Metcalf and Cowgill. All of the parties to this action were engaged in the investment banking business. In 1926 Metcalf, Cowgill & Co. promoted the organization of the Minnesota Southern Telephone Company, a corporation. In 1927 the three plaintiff companies and the partnership Metcalf, Cowgill & Co. participated in the distribution of an issue of bonds of the Minnesota Southern Telephone Company; each of the plaintiff companies selling a portion of the bonds and receiving a stock interest in the corporation. In January, 1928, after the sale of the bonds above mentioned had been completed, Metcalf, Cowgill & Co. invited plaintiffs-appellants to attend a meeting at its office in Des Moines, Iowa. At this meeting it was explained that Metcalf, Cowgill & Co. had acquired options on the Imperial Utilities Corporation and the Harbor City Water Company, utility properties in California. It was further explained that a holding corporation to be known as Great Western Utilities Corporation would be organized and would acquire the stock of the Minnesota Southern Telephone Company, Imperial Utilities Corporation, and Harbor City Water Company, and that this would require the distribution of bonds of the Great Western Utilities Corporation to the extent of $400,000. The subject of acquiring other utility properties in California and the necessity of organizing a group to handle the necessary financing of such enterprise was also discussed. Metcalf, Cowgill & Co. proposed that Smith, Landeryou & Co., W. D. Hanna & Co., and Fidelity National Company join with them in handling the $400,000 financing then at hand, and such further financing as additional acquisi-

tions would require. It was proposed that Metcalf, Cowgill & Co. be manager of this group, that each of the four interested companies should handle one-fourth of all bonds necessary to be distributed, and that the equity in the properties acquired should be 70 per cent to Metcalf, Cowgill & Co., who were to do the work connected with the purchase and preliminary financing, and 10 per cent to each of the plaintiffs-appellants.

No one representing W. D. Hanna & Co. or Fidelity National Company attended the meeting above referred to, but a few days later, Mr. Kramer, of W. D. Hanna & Co., met with Metcalf and Cowgill and Hollingsworth at the office of Metcalf, Cowgill & Co., partnership, in Des Moines, and the same matters were gone over with them. The same matters were also gone over with Mr. Alexander, of the Fidelity National Company, in Kansas City, by Mr. Cowgill. On January 17, 1928, a letter covering the terms of the disposition of the $400,000 bond issue of Great Western Utilities Corporation was sent to each of plaintiffs-appellants by Metcalf, Cowgill & Co. Late in January, 1928, Messrs. Smith and Landeryou, at the suggestion of Metcalf and Cowgill, and at the expense of the syndicate, made a trip to California to examine the utility properties that had already been acquired and other properties then in prospect in California. They there met Mr. Cowgill and Mr. Hollingsworth, who told them that arrangements were about completed for the purchase of Bear Valley Utility, which would necessitate raising the bond issue of Great Western Utilities from $400,000 to $600,000. While in California, Messrs. Smith and Landeryou inspected the Bear Valley Utility and other utility properties.

On February 28, 1928, a meeting was held at the office of Metcalf, Cowgill & Co., at which Messrs. Hanna, Kramer, Smith, Landeryou, Metcalf, Cowgill, and Hollingsworth, and also Mr. McArthur, of the Fidelity National Company, were present. At this time the Bear Valley Utility Company had been acquired and plans were discussed for disposing of the $600,000 bond issue of Great Western Utilities Corporation necessitated by this new acquisition. On the following day, February 29, 1928, Metcalf, Cowgill & Co. sent another letter to the members of the group containing the terms and conditions under which said $600,000 of bonds of Great Western Utilities Corporation were to be handled. According to the agreement reached by the parties at the meeting and the conditions as stated in the letter, each member of the group was

responsible for one-fourth of the bond issue, and Metcalf, Cowgill & Co. were to have 70 per cent, and each of the other members of the group 10 per cent of the outstanding stock of the Great Western Utilities Corporation. The disposition of bonds was begun by all members of the group and was completed about May 28, 1928.

At this time the properties included in the holdings of the syndicate through the Western Utilities Corporation were the Minnesota Southern Telephone Company, the Imperial Utilities Corporation, the Harbor City Water Company, and the Bear Valley Utility Company. About April 1, 1928, a Mr. White, who was an employee of the Metcalf, Cowgill & Co., was sent to California to search for additional properties. Frank Dougherty, who was the president of the Great Western Utilities Corporation, was also in California, and he and Mr. White examined other properties with a view to acquiring them for the syndicate. As a result of these efforts, options were secured for the purchase of four additional utilities in California, namely, Highland Domestic Water Service Company, Ojai Water Service Company, Huntington Beach Water Company, and Peoples Water Company of Palms. The options for the purchase and the payments made on such options were made by Metcalf, Cowgill & Co.

Following the purchase of these options, Metcalf, Cowgill & Co. called a meeting at their office in Des Moines, on July 9, 1928. At this meeting Mr. Metcalf handed all the persons present a copy of a printed circular showing a proposed plan for financing a new bond issue of the Great Western Utilities Corporation. The plan proposed called for an issue of bonds of $1,600,000. The list of properties included in the proposed financing consisted of the four properties which had previously been acquired and included in the previous issue of $600,000, and the four additional properties in California on which Metcalf, Cowgill & Co. had secured options. At this meeting it was the consensus of opinion that the new financing required was more than could be accomplished by the four members of the syndicate, and that they should try to secure a new member. Following this meeting efforts were made to secure a new member for the syndicate, with whose assistance they might be able to finance the bond issue of $1,600,000, but no such new member was secured.

Pending the search for a new member of the syndicate, negotiations were instituted in California which eventually led to the sale

of all the properties of Great Western Utilities Corporation and the four additional properties upon which options were held by Metcalf, Cowgill & Co., and on August 8, 1928, three contracts were entered into covering the sale of all these properties to Davis-Longstaff & Co. One of these contracts provided for the sale of all the interest of the syndicate in Great Western Utilities Corporation and its three subsidiaries, to wit, Imperial Utilities Corporation, Harbor City Water Company, and Bear Valley Utility Company which had previously been acquired by the syndicate. The second and third contracts provided for the sale of the stock of the four additional companies, to wit, Peoples Water Company of Palms, Huntington Beach Water Company, Highland Domestic Water Service Company, and Ojai Water Service Company; the sale of the first three companies above mentioned being contained in one contract, and the sale of the remaining property being contained in the other contract. In connection with the execution of the above contracts, Metcalf, Cowgill & Co., notified the plaintiffs of the terms of such sale and asked that plaintiffs immediately wire them authority to sell the stock held by plaintiffs in the Great Western Utilities Corporation, which authority was executed by all of the plaintiffs. At the time this authority to sell stock was given by the plaintiffs, they were told by Mr. Cowgill that the profit to each of them would be not less than $13,316.

The sale of all the properties was consummated pursuant to the three contracts of August 8, 1928, and some time thereafter an accounting was made by Metcalf, Cowgill & Co. This accounting showed a gross profit of $158,160, from which there was deducted $25,000 expenses incurred in the transaction, leaving a net balance of $133,160. Settlement was made with each of the plaintiffs pursuant to said statement of account and each of them received $13,316, representing 10 per cent of the net profit. Some time after this settlement had been made, the plaintiffs discovered that the gross profit of $158,160, covered by the accounting made by Metcalf, Cowgill & Co., included only the original four properties whose stock had been held by the Great Western Utilities Corporation, and that it did not include the four California properties which had been acquired after the bond issue of $600,000 of the Great Western Utilities Corporation had been issued and disposed of by the plaintiffs. Upon taking this matter up with Metcalf, Cowgill & Co., plaintiffs were informed that the four latter companies were

not included in the accounting made to plaintiffs because these latter companies had never been a part of the properties held by the syndicate, and that plaintiffs were not entitled to any share in these profits. Thereupon the plaintiffs instituted this suit, in which they alleged generally the facts above stated; that the undertakings of the plaintiffs and the defendant, Metcalf, Cowgill & Co., a partnership, in connection with all the properties above referred to constituted a joint adventure of the plaintiffs and said defendant, Metcalf, Cowgill & Co., a partnership; that A. E. Hollingsworth was a member of said partnership, Metcalf, Cowgill & Co.; that the corporation, Metcalf, Cowgill & Co., Inc., had been organized and had taken over all the assets and assumed all the liabilities of said partnership and its members; and asked for an accounting as to all the properties included in the three contracts of sale executed by Metcalf, Cowgill & Co. to Davis, Longstaff & Co. on the 8th day of August, 1928, and for judgment against the defendants for the amount found due plaintiffs.

The trial court found that, in the transactions connected with all the properties included in said three contracts, 'the plaintiffs and defendant Metcalf, Cowgill & Co., a partnership, were members of a joint adventure, and that the defendants Metcalf, Cowgill & Co., a partnership, Donald J. Metcalf, Elvyn S. Cowgill, and Metcalf, Cowgill & Co., Inc., a corporation, were liable to plaintiffs for the profits of said joint adventure, and gave judgment accordingly. The trial court held further that the defendant A. E. Hollingsworth was not a member of the partnership Metcalf, Cowgill & Co., and gave him judgment for his costs. The plaintiffs appeal from that portion of the decree of the trial court in favor of defendant A. E. Hollingsworth, in finding that he was not liable or indebted to plaintiffs, or any of them, in any amount. The defendant Hollingsworth appeals from that portion of the decree of the trial court holding that a joint adventure had been entered into by and between the plaintiffs and the defendants Metcalf, Cowgill & Co., Donald J. Metcalf, and E. S. Cowgill. The defendants Metcalf, Cowgill & Co., Donald J. Metcalf, and Elvyn S. Cowgill appeal from that portion of the decree of the trial court which holds that a joint adventure had been entered into between the plaintiffs and said defendants. In this opinion the plaintiffs will be referred to as the appellants, the defendant Hollingsworth as appellee, and the

defendants Metcalf, Cowgill & Co., Donald J. Metcalf, and Elvyn S. Cowgill as cross-appellants.

I. The first proposition with which we are confronted is that of joint adventure. The burden was upon the appellants to prove the existence of the joint adventure claimed by them, and that such joint adventure included the four California properties acquired subsequent to the Metcalf, Cowgill & Co. letter of February 29, 1928. In 16 C. J. 847, it is said:

"A joint adventure can exist only by voluntary agreement of the parties to it. * * * The usual requisites as to form and validity apply to a contract of this character. To constitute such a contract no particular form of expression or formality of execution is necessary. It need not be express but may be implied in whole or in part from the conduct of the parties."

It is the contention of the appellants that an oral agreement was made between them and Metcalf, Cowgill & Co. shortly before the 17th day of January, 1928; that at said time it was proposed by Metcalf, Cowgill & Co. that Metcalf, Cowgill & Co. and appellants organize a group to look after financing then required in connection with properties to be taken over by Great Western Utilities Corporation, as well as other properties which might be acquired in the future; that the financing then required was the disposition of $400,000 of bonds, but that it was expressly stated and understood that other properties would be acquired to be financed by the appellants and Metcalf, Cowgill & Co. in the future; that, under the terms of the agreement then proposed and agreed to, each of the appellants and Metcalf, Cowgill & Co. were to dispose of one-fourth of the bond issue; that Metcalf, Cowgill & Co. were to attend to the purchasing of future properties and to the preliminary financing thereof; that, because of this additional work and financing, Metcalf, Cowgill & Co. were to be the owners of 70 per cent of the equity and each of the appellants was to be the owner of 10 per cent of the equity in the properties thus purchased. Appellants also contend that the understanding and agreement thus reached is further evidenced by the conduct of all the parties, including Metcalf, Cowgill & Co.; that, while at the time of the first meeting in January, 1928, the financing then required was the disposition of $400,000 of bonds of Great Western Utilities Corporation, an additional property in California was acquired soon there-

after, and such bond issue was increased to $600,000 and was disposed of by appellants and Metcalf, Cowgill & Co., pursuant to the agreement made. They further contend that the additional four properties later purchased in California were purchased pursuant to the same agreement, and that the appellants had a right to share in the financing and in the profits derived from the sale of said properties.

Appellee and cross-appellants do not deny that an agreement was entered into between Metcalf, Cowgill & Co. and the appellants. In fact, they allege two such agreements, the terms of which are contained in the communications of Metcalf, Cowgill & Co. on January 17 and February 29, 1928, and the acceptance of the terms thereof by appellants. They contend that the agreement of January 17 was superseded by and evidenced by the letter of February 29, and that, aside from these two agreements, evidenced by the letters above referred to, there never was any agreement between Metcalf, Cowgill & Co. and the appellants. The letter of February 29, 1928, contains the following paragraph:

"8. As Managers of this Underwriting Group account, we shall not be responsible for the validity or regularity of, nor for any liability attaching with respect to, the origination or existence of the Great Western Utilities Corporation, or of its stock, bonds or other securities, nor for the performance of any Agreement of the obligor of the Bonds, or those of its subsidiaries, or of the acquisition of any stock or property determined upon by the Company under any of the provisions of this issue of bonds or, in any other manner, or for any statements or representations made in the descriptive circular or other advertising material in connection herewith, except for want of good faith and such obligations as we expressly assume hereunder and no obligation not expressly assumed shall be implied. The delivery of Bonds shall be on a when, as and if issued basis, subject to approval of our counsel. Distribution to the members of this Account and to the Selling Group members, of the profits, losses and expenses, and our written statement with respect thereto, shall be conclusive. Nothing herein contained shall constitute the parties hereto partners or shall render any one of the members of this Group liable for more than the amount of his participation."

Appellee and cross-appellants assert that this negatives the

existence of any other agreement, and that the attempt of the appellants to prove that the agreement between them and Metcalf, Cowgill & Co. applied to the four California properties which were acquired after February 29, 1928, is a violation of the rule against the use of parol evidence to vary or contradict the terms of a written instrument.

Appellants meet the claim that the portion of the letter of February 29, 1928, above set out negatives the existence of any other agreement with the statement that the letter itself does not purport to contain all of the agreements entered into between the parties, that it was written with reference to the particular bond issue of $600,000 then under consideration, and that another provision of this same letter clearly shows that there was an agreement between the parties which contemplated the financing which might arise in connection with the purchase of other properties in the future. The portion of the letter thus referred to by appellants is as follows:

"Should the occasion arise that you elect not to join with us or participate in any financing of the Corporation which we might offer you, then you will sell your stock to us at a price to be agreed upon by three persons as follows:

"You shall appoint one representative, we shall appoint one, and a third shall be agreed upon by the first two. The decision of any two out of the three shall be binding."

In our opinion the portion of the letter of February 29, 1928, quoted and relied on by appellee and cross-appellants, is not controlling. This letter was written with specific reference to the financing required at that time. It does not show that there was no agreement between the parties contemplating the acquisition and financing of other properties. On the other hand, the portion of this letter quoted and relied on by appellants clearly indicates that there might be other financing in which the appellants were obliged to take part. Such other financing is not defined or referred to in the letter in question, and appellants contend that the other financing thus referred to was that of properties that might later be acquired and which were specifically referred to and contemplated by the parties in their oral agreement. Under this state of facts we think evidence was admissible as to the oral agreement claimed by appellants.

In our opinion the evidence sufficiently shows that there was an understanding and agreement between appellants and Metcalf, Cowgill & Co. under which the appellants and Metcalf, Cowgill & Co. were each to dispose of one-fourth of the issues necessary to finance the properties purchased for the syndicate, that Metcalf, Cowgill & Co. were to do the work connected with the purchasing of such properties and the preliminary financing required by such purchases, and that, because of this additional work and preliminary financing, Metcalf, Cowgill & Co. was to be the owner of 70 per cent and each of the appellants was to be the owner of 10 per cent of the equities in the properties thus acquired. We think, moreover, the conversations which occurred at the meetings preceding the letters of January 17 and February 29, 1928, clearly show that the parties had in contemplation the enlargement of the scope of the syndicate; that they particularly discussed the acquisition of other California utility properties and understood and agreed that as these additional properties were acquired they would be financed by the appellants and Metcalf, Cowgill & Co. on the same terms. Not only the oral conversations and the portion of the letter of February 29, 1928, quoted and relied on by appellants, but the conduct of Metcalf and Cowgill supports this view. As to the four properties concerning which the appellee and cross-appellants claim there was no agreement, the evidence shows that, in the acquisition of these properties, the expenses incurred by Metcalf, Cowgill & Co. in investigating same, and the amount aggregating more than $100,000 which was paid by Metcalf, Cowgill & Co. in securing the options for same, were charged to Great Western Utilities Corporation on the books of Metcalf, Cowgill & Co. Following the acquisition of these properties, a meeting was called by Metcalf, Cowgill & Co. at their office in Des Moines on July 9, 1928. At this meeting it was explained by the members of the partnership Metcalf, Cowgill & Co. how it was proposed to finance these additional acquisitions, and a circular had already been prepared by Metcalf, Cowgill & Co. in which the method to be pursued was set out. Moreover, in the discussion which took place, it clearly appeared to be the understanding of Metcalf and Cowgill, as well as the appellants, that these additional four properties had been acquired by Metcalf, Cowgill & Co. for the syndicate, pursuant to the understanding and agreement previously had with the appellants. We think the evidence fully sustains the contention of the appellants

that the four California utility properties, acquired after the financing proposed in the letter of Metcalf, Cowgill & Co. of February 29, 1928, had been completed, were acquired pursuant to and were subject to the terms of the agreement which had previously been made by Metcalf, Cowgill & Co. and the appellants herein.

Appellee and cross-appellants contend, however, that, even if the agreement made between Metcalf, Cowgill & Co. and the appellants contemplated properties to be acquired in the future and included the four California properties purchased by Metcalf, Cowgill & Co. for which no accounting was made, the appellants breached such agreement by refusing to carry out their part in the financing of these four additional properties, and are not entitled to any share in the profits derived therefrom. We think the evidence utterly fails to support this contention. The evidence shows that the financing required by the acquisition of the four additional properties involved disposing of an issue of the $1,600,000 bonds. In the discussion concerning such proposed financing which took place at the meeting at the office of Metcalf, Cowgill & Co. in Des Moines on July 9, 1928, it was the general opinion of all parties, including Metcalf and Cowgill, that, under the conditions of the bond market then existing, it would very probably be impossible for the four members of the syndicate to dispose of a bond issue of that magnitude, and the conclusion was reached that it would be advisable to try to secure an additional member to join the syndicate to assist in disposing of this bond issue. At this meeting the names of various concerns were suggested that might be induced to join the syndicate, and, pursuant to the conclusion reached, Mr. Metcalf and Mr. Cowgill went to Chicago in an endeavor to find a new member for the syndicate. While engaged in the effort to find such new member, Metcalf, Cowgill & Co. wrote and telephoned other members of the syndicate in regard to what they were doing and the progress being made. It was while this search for an additional member for the syndicate was still in progress that Mr. White, an employee of Metcalf, Cowgill & Co., met in Los Angeles a Mr. Roth, who was connected with Davis, Longstaff & Co., and negotiations were begun which eventually resulted in the sale of all of the properties to Davis, Longstaff & Co.

Even if the appellants had refused to carry out the terms of the agreement and dispose of one-fourth of the bonds necessitated by the purchase of the additional properties, this would not entitle

Metcalf, Cowgill & Co. to sell these properties and treat the appellants as having no interest therein. Under the terms contained in the letter of February 29, 1928, the course to be pursued by Metcalf, Cowgill & Co. in such a contingency was specifically pre-scribed. The refusal of any of the appellants to assist in any financing of Great Western Utilities Corporation offered by Metcalf, Cowgill & Co. obligated such appellant to sell his stock to Metcalf, Cowgill & Co. at a price to be agreed upon by three persons to be appointed as provided in the letter. Metcalf, Cowgill & Co. made no attempt to follow the procedure prescribed, and cannot now claim that appellants' rights were terminated by their refusal to take part in financing the four California properties in controversy.

We think the evidence supports the contention of the appellants that a joint adventure did exist between the appellants and Metcalf, Cowgill & Co., that such a joint adventure included the four addi-tional properties acquired after the financing of the $600,000 bond issue of Great Western Utilities Corporation had been completed, and that the appellants are entitled to an accounting as to all the properties included in the three contracts of sale made by Metcalf, Cowgill & Co. to Davis, Longstaff & Co. on August 8, 1928.

II. It is further contended by the appellants that the ap-pellee, A. E. Hollingsworth, was a member of the partnership Met-calf, Cowgill & Co., that he, as well as the other two partners, Messrs. Cowgill and Metcalf, is personally liable for the debts of the partnership, and that the appellants should have a judgment against him as well as the partnership and the other partners for the amount found owing to the appellants by the partnership under the accounting. In support of this contention the appellants argue that the evidence shows that said Hollingsworth furnished much of the capital of the partnership; that he took an active part in the conduct of its affairs; that he was introduced to the appellants as a partner and referred to as a partner in their presence and in his presence; and that he was sharing in the profits of such partner-ship. Appellants argue that this is sufficient to show that Hollings-worth was in reality a partner and as such is liable for the losses of the partnership. On the other hand, the appellee and the cross-appellants claim that Hollingsworth's connection with the partner-ship was based upon a written contract which not only does not create the relation of partnership, but clearly negatives such status on his part. Such written contract provided that Hollingsworth

would supply collateral to the extent of 10 per cent and not to exceed $10,000, to the loans of the partnership Metcalf, Cowgill & Co. at the Des Moines National Bank, and that, in consideration for supplying such collateral, the partnership should pay him 20 per cent of the net profits of the business conducted by it during the preceding year. Such written contract contained the further provision:

"It is further agreed that in case the party of the second part shall sustain any loss by reason of the subjection of the securities which he may pledge with said bank as security for the payment of the indebtedness of the parties of the first part, the parties of the first part shall reimburse the party of the second part for such loss with interest thereon from the date such loss shall be actually sustained, at the rate of six per cent (6%) per annum, payable semi-annually."

It is quite apparent that, if Hollingsworth's remuneration for furnishing of collateral depended upon the earnings of the partnership, he would naturally be interested in promoting the business of the partnership. We think this affords sufficient explanation of any activities of Hollingsworth in connection with the partnership, without attributing to him the interest of a partner. Appellants claim that, when properties were being purchased in California, large amounts of capital, in excess of the $10,000 collateral which he had agreed to maintain at the bank, were furnished by him in financing the purchase of these properties, that he received either no interest or a merely nominal rate of interest for the money thus furnished, and that, when Metcalf, Cowgill & Co., Inc., a corporation, was organized in September, 1928, 20 per cent of the capital stock was issued to Hollingsworth. Appellants claim that this is strong evidence of the fact that Hollingsworth owned 20 per cent of the capital of Metcalf, Cowgill & Co., the partnership, and indicates that he was, therefore, an actual partner. The burden was upon the appellants to prove that Hollingsworth was a partner, as alleged by them. This could only be done by showing that an agreement or arrangement existed between Hollingsworth and the other members of the firm of Metcalf, Cowgill & Co. by the terms of which Hollingsworth furnished capital or devoted his time, or both, to the partnership, and that he was to share in the profits and be liable for the losses thereunder. It is true that, if it be shown that

there is an agreement for a community of interest in the capital and a sharing of the profits, the liability for losses may be implied. The fact that large sums of money were furnished in financing the partnership's purchase of the California properties would not of itself constitute Hollingsworth a partner. The loaning of money to the partnership does not constitute the person making the loan a partner. By making the loan he becomes a creditor of the partnership and not the owner of a share in the partnership property. Proof that Hollingsworth loaned money to the partnership is not sufficient to establish that he had a community of interest with the other partners. Under his written contract Hollingsworth was entitled to 20 per cent of the profits for the risk assumed in furnishing collateral at the bank, and was expressly released from any claims for losses in connection with the collateral thus furnished. He was entitled to 20 per cent of the profits of the partnership under this contract. If some third person had loaned money to the partnership, thereby enabling it to greatly increase its profits, Hollingsworth would still be entitled to 20 per cent of this increase.

The fact that large sums of money were repaid to Hollingsworth by the partnership indicates that the money thus repaid represented loans, and the fact that, so far as the evidence shows, he never demanded or received any more than 20 per cent of the profits indicates that the share of the profits thus received by him was received under the terms of his contract. Nor does the fact that 20 per cent of the stock of Metcalf, Cowgill & Co., Inc., was issued to Hollingsworth prove that he was the owner of 20 per cent of the capital of the partnership. The evidence does not show that Hollingsworth left his profits for preceding years with the partnership, nor does it show what Hollingsworth's share of these profits would have amounted to even if it had been allowed to accumulate and to remain in the partnership. Hollingsworth's 20 per cent of the profits claimed by Metcalf, Cowgill & Co., the partnership, growing out of the sale of the properties included in the three contracts of August 8, 1928, would alone exceed the $20,000 represented by the stock issued in his name. It cannot be said, therefore, that the $20,000 par value of stock issued to him by the corporation of Metcalf, Cowgill & Co., Inc., represents his 20 per cent interest in the partnership. In our opinion neither the loans made to the partnership by Hollingsworth, nor the 20 per cent of the net profits to which he was entitled from the partnership, nor

the fact that the stock issued to him in the corporation represented 20 per cent of the stock of the corporation, nor all of these facts together, is sufficient to prove that Hollingsworth had entered into any agreement or arrangement by which he became a partner in the partnership of Metcalf, Cowgill & Co. The existence of any agreement or arrangement which would constitute Hollingsworth a partner is positively denied not only by Hollingsworth but by Metcalf and Cowgill. It should not be overlooked that in testifying both Metcalf and Cowgill so testified, although it would naturally be to their interest to testify to the contrary. We think that, under the evidence in this case, the appellants have failed to maintain the burden of proving the existence of an actual partnership in which Hollingsworth was a partner.

Nor do we find sufficient evidence of any conduct on the part of Hollingsworth by which he would be estopped to deny his liability to the appellants as a member of the firm of Metcalf, Cowgill & Co. It is true that the evidence of the appellants tends to show that on different occasions Mr. Hollingsworth was introduced as a partner by Metcalf or Cowgill, and that on other occasions he was referred to in his presence as being a partner of Metcalf and Cowgill. On the other hand, Metcalf and Cowgill and Hollingsworth all positively deny that any introduction was ever made of Hollingsworth as a partner by either Metcalf or Cowgill, or any reference made to him as a partner. Here, again, both Metcalf and Cowgill are testifying to a fact when it would be to their interest to testify to the contrary. Moreover, the evidence of the appellants makes it quite doubtful whether the fact that Hollingsworth was introduced and referred to as a partner, even if it be true, had anything to do with their decision to enter the arrangement made with Metcalf, Cowgill & Co. Mr. Smith testified that he would not say that Smith, Landeryou & Co. would not have gone into the syndicate if they had known that Hollingsworth was not a partner. Alexander testified that Cowgill referred to Hollingsworth as a partner, but that the term was used rather loosely at times, and that he never asked, and Cowgill never told him, what the make-up of the firm was or whether in fact they were partners or not, while Landeryou testified that they would not have gone into the syndicate if they had not believed that Hollingsworth was a partner, because they were relying upon his money and his standing. It must be further borne in mind that some of the alleged references made by Metcalf and

Cowgill to Hollingsworth as a partner were not made in the presence of Hollingsworth and would not be binding upon him. On the whole, we do not feel that the evidence is sufficient to estop the appellee, Hollingsworth, from denying that he was a partner and to make him accountable as a partner to the appellants herein.

III. Appellants finally contend that, even if Hollingsworth be not a partner in the firm of Metcalf, Cowgill & Co., he received 20 per cent of the profits belonging to appellants that were not accounted for by Metcalf, Cowgill & Co., and that he is liable to appellants for this amount. Appellants point out that, under the findings of the trial court, $140,838.90, exclusive of interest, was their share of the profits not accounted for by Metcalf, Cowgill & Co., and allege that Hollingsworth received 20 per cent of this amount, that is, $28,177.74, belonging to them. So far as we can discover from the record, this matter was not presented or argued in the lower court, and it is not touched upon in the opinion of the trial judge. Moreover, we do not find any allegation in the petition or amendment thereto which specifically raises this issue. Unless this question was raised by the pleadings and was before the trial court, it cannot be considered here, because the appellee should not be subjected to a liability concerning which there was no issue in the trial court and in regard to which there was no reason why he should introduce any evidence. Aside from this, however, we do not believe the evidence is such that the claim here made by the appellants can be sustained. We do not find and appellants have not pointed out any evidence in the record that any particular sum of money or property of any stated value was turned over to appellee by Metcalf, Cowgill & Co. out of the profits derived by them from the sale of the additional properties for which no accounting was made. Appellants stress the fact that all the assets of Metcalf, Cowgill & Co. were turned over to Metcalf, Cowgill & Co., Inc., the corporation, and that 20 per cent of the stock of the corporation was issued to Hollingsworth, and argue therefrom that Hollingsworth received 20 per cent of the funds belonging to plaintiffs. When the assets of Metcalf, Cowgill & Co., the partnership, were turned over to the corporation, Metcalf, Cowgill & Co., Inc., the corporation assumed all the liabilities of the partnership. The actual value received by Hollingsworth, in becoming the owner of 20 per cent of the stock of the corporation, would, therefore, necessarily depend not only on the value of the assets turned over, but

also on the amount of liabilities of the partnership that were assumed. In the absence of evidence showing any amount of money or the value of property received by Hollingsworth out of the profits belonging to appellants, it is impossible for us to say in what amount, if any, Hollingsworth is indebted to appellants.

We find no reason for disturbing the decree and judgment of the trial court, and it is accordingly affirmed.—Affirmed.

ALBERT, C. J., and all the Justices concur, except EVANS, J., who takes no part.