**FARM–FUEL PRODUCTS
CORP., Appellee,**

v.

**GRAIN PROCESSING
CORPORATION, Appellant.**

**BEAVER VALLEY CANNING CO.,
Delmar A. Nelson, Robert W.
Sackett, Appellants,**

v.

**GRAIN PROCESSING
CORPORATION, Appellee.**

No. 86–1115.

Supreme Court of Iowa.

Sept. 21, 1988.

Rehearing Denied Oct. 13, 1988.

Henry A. Harmon and Mark J. Wiedenfeld, Des Moines, for Grain Processing Corp.

Maurice B. Nieland, Sioux City, and Thomas S. Reavely, Des Moines, for Farm–Fuel Products Corp., Beaver Valley Canning Co., Delmar A. Nelson, and Robert W. Sackett.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, LAVORATO, and ANDREASEN, JJ.

LARSON, Justice.

The plaintiff, Farm–Fuel Products Corp., retained a firm called ACR Process Corp. to design a distillery for the production of corn alcohol (ethanol). The plant failed, and Farm–Fuel sued ACR and Grain Processing Corporation (GPC), as well as others, on theories of negligence and breach of warranty. GPC appealed a judgment rendered against it, and the three stockholders of Farm–Fuel filed a separate appeal from the court's dismissal of their individual suit against GPC. We affirm on both appeals.

The oil crisis of the mid–1970s caused a rush toward alternative energy sources, including gasohol (a ten percent ethanol and ninety percent gasoline mixture) as an alternative to straight gasoline. GPC, one of the world's largest manufacturers of corn alcohol, had been a producer of ethanol for several years; in fact it had been among the world's largest producers. But there was a problem with using ethanol in internal combustion engines because it ordinarily contained about five percent water. John Chambers, a well-known expert in the alcohol industry, invented and patented a method of removing water residue by using unleaded gasoline. When used as a motor fuel, of course, traces of gasoline left in the ethanol would not be a problem. Chambers and other family members formed the ACR Corporation for the purpose of marketing this technology. ACR, as it turned out, was long on ethanol technology but short on capital.

ACR and GPC entered into the "licensing" agreement (which Farm–Fuel characterized as a joint venture agreement) which lies at the heart of this case. Under this agreement, the parties pooled their experience, technology, know-how and patent rights "for the purpose of developing and marketing an energy responsible process for the conversion of renewable resources to liquid motor fuel." Under this contract, ACR and GPC agreed to market their technology to other manufacturers in exchange for a royalty to be paid to GPC and ACR.

A group of Iowa residents from the Spencer area also saw the potential for corn ethanol as a motor fuel additive, and they formed a corporation called Farm–Fuel Products Corporation for the purpose of building a distillery. Farm–Fuel contracted with ACR to design and oversee the construction of a relatively small plant in an abandoned pea cannery in Storm Lake. The purpose was to ferment and distill high moisture corn into ethanol, using the Chambers (or ACR) process.

The plant began operation but immediately encountered problems. These problems included defects in its mash cooler, distillation columns, and evaporators. The plant struggled, then closed. Testimony, perhaps, to an inability of northerners to build and operate a "still."

When the project failed, Farm–Fuel sued ACR and other defendants, including GPC, on theories of negligence and breach of warranty. The jury rejected Farm–Fuel's negligence claim but returned a substantial verdict on its breach of warranty claim. GPC appealed, asserting that the court erred: (1) in refusing to direct a verdict against Farm–Fuel based on insufficiency of the evidence of a joint venture between ACR and GPC; (2) in refusing to direct a verdict against Farm–Fuel on the breach of warranty issues; (3) in its instructions; (4) in its rulings on evidence; and (5) in refusing to grant a new trial based on Farm–Fuel's alleged misrepresentation to the court concerning a settlement with the defendants other than GPC. The separate appeal of Farm–Fuel's shareholders raises the issues of the court's refusal to allow an amendment to their petition and its directing a verdict against them on their individual suit against the defendants.

Because ACR was a corporation with limited assets, Farm–Fuel looked primarily to GPC for compensation, claiming it was liable for the acts of ACR on the theory of joint venture.

An appeal based on sufficiency of the evidence in a law action raises only one question: whether there is substantial evidence to support the finding. Iowa R.App. P. 14(f)(1). In making that determination, we construe the evidence in the light most favorable to the judgment. *See Adam v. Mt. Pleasant Bank & Trust Co.*, 387 N.W. 2d 771, 773 (Iowa 1986); *Murray v. Conrad*, 346 N.W.2d 814, 817 (Iowa 1984).

## I. *Sufficiency of the Evidence of Joint Venture.*

We discussed joint ventures in *Brewer v. Central Construction Co.*, 241 Iowa 799, 806, 43 N.W.2d 131, 136 (1950):

> A joint venture is defined as an association of two or more persons to carry out a single business enterprise for profit; also as a common undertaking in which two or more combined their property, money, efforts, skill or knowledge.
>
> As a *general* rule, a joint venture is characterized by a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits and a duty to share the losses.

(Emphasis added.)

In *Pay–N–Taket, Inc. v. Crooks*, 259 Iowa 719, 724, 145 N.W.2d 621, 625 (1966), we said this about joint ventures:

> A partnership or joint adventure, a limited partnership, is usually a contract where two or more persons place their money, labor and skill in some business to be carried on by the partnership, with an agreement to divide the profits and share the losses.

The parties to this appeal have identified five indicia which they have characterized as the "elements" of a joint venture. They are:

(1) a common undertaking;

(2) a joint proprietary interest in the subject matter;

(3) a mutual right to control;

(4) a right to share in the profits; and

(5) a duty to share the losses.

It might be argued that these five factors are not "elements" in the sense that they must all be proven in every case. It could be argued they are only "character[istic]" of a joint venture, *e.g.*, *Brewer*, 241 Iowa at 806, 43 N.W.2d at 136. In any event, the court here considered them to be elements and instructed the jury that they must all be proven in order to establish a joint venture. The plaintiff did not complain. GPC asserts that no substantial evidence supports any of the "elements" while Farm–Fuel counters that they are all established by substantial evidence.

In deciding whether a joint venture agreement exists, we have said that "no particular form of expression or formality of execution is necessary. It need not be expressed but may be implied in whole or in part from the conduct of the parties." *Pay–N–Taket, Inc.*, 259 Iowa at 724, 145 N.W.2d at 625. Even the criteria for a joint venture might vary from case to case. *See* 46 Am.Jur.2d *Joint Venture* § 1, at 22 (1969) ("[D]espite the general acceptance of the criteria listed above, it has been said that courts have not laid down any very certain definition of what constitutes a joint venture, nor have they established a very fixed or certain boundary thereof, contenting themselves in determining whether the facts of a particular case constitute the relationship of joint venture.").

■ Whether there was substantial evidence of a joint venture is the most troublesome issue in this case. There is strong evidence to support both sides of the argument. GPC concedes that it had a joint venture with ACR for some purposes, but it claims that the development of the Farm–Fuel plant was not among them. It contends that it consistently and expressly disavowed any interest in the development of such plants because they were too small to be economically feasible. Farm–Fuel counters, with some persuasion, that the scope of the joint venture was a fact issue and that the jury's finding is supported by substantial evidence. We will set out only portions of the evidence which support the

jury's findings. (The trial of this case lasted approximately nine weeks, producing hundreds of exhibits and thousands of pages of transcript.)

On January 5, 1978, representatives of GPC and ACR met to discuss the potential of a joint development of their respective alcohol technology. According to the notes of the meeting, a representative of ACR suggested that GPC and ACR build the first alcohol plant and that "the first group with a successful plant will make a handsome profit." Among the objectives of the two corporations, it was suggested, would be to "[p]ossibly have a joint venture for gasohol—[a] separate corporation which would then license others."

These notes also proposed the drafting of a letter of intent by GPC and ACR and, "if successful, then enter into joint venture which would provide for parties' objectives." Suggesting a prominent role for GPC, the notes show that "GPC seeking controlling interest, be able to run show, [but] not opposed to have Rob [principal of ACR] involved in management."

On the following day, GPC and ACR executed a "Confidential Disclosure Agreement" by which the parties agreed to the exchange and confidentiality of "technical information and business information relating to the manufacture, use and sale of alcohol and alcohol-gasoline mixtures (gasohol)." One stated reason for the exchange of technology was the parties' intent to make a joint application to the United States Department of Agriculture for a guaranteed loan for the construction of a gasohol pilot plant.

On January 31, 1979, GPC and ACR signed one of the pivotal documents in this case, the licensing agreement for combining "their respective Know–How and experience for the purpose of developing and marketing an energy responsible process for the conversion of renewable resources to liquid motor fuel, more specifically, a commercial process for producing ethanol-gasoline mixtures and/or ethanol-gasoline substitute ... mixtures." The agreement calls for the pooling of the parties' technologies through a licensing and sublicensing arrangement and the sharing of all royalty payments received from the commercial use of their technology. This agreement remained in force until July 14, 1981, when it was rescinded by the parties.

On August 21, 1980, while the GPC/ACR agreement was in effect, ACR entered into the contract for the design of the Farm–Fuel plant which lies at the heart of this appeal. GPC was not a party to the contract; if it is to be held liable for any warranties contained in the contract, it must be on the basis that a joint venture existed with ACR. GPC, of course, claims that the Farm–Fuel contract was beyond the scope of a joint venture because of the plant's size.

Evidence that the GPC/ACR venture did in fact include small plants included the publication of a workbook on February 26, 1979, which contained information provided by ACR and GPC on the establishment of small alcohol plants. The original version of this workbook was copyrighted by GPC, the second version by ACR. The workbook directed all inquiries to be made directly to GPC, which received over 600 of them.

GPC acknowledged a substantial role in the area of alcohol technology. In a memo of July 10, 1980, just prior to the ACR/Farm–Fuel contract, the president of GPC stated:

> The reader should now be reminded that GPC considers it has a near-total package of technologies to market because of a license agreement it has with ACR Corporation (Chambers). That agreement provides, among other things, that our fee for technology will be two percent of sales and that ACR shall be paid 45% of all fees GPC obtains for our combined technologies. Thus, ACR should be required to be responsible for 45% of the obligations and risks of the licensing agreements. But ACR has no material financial strength. This, then, is additional reason why liquidated damages cannot be allowed to exceed the total license fee.

While this memo expressed a reluctance by GPC to participate in "small" facilities, those under 20,000,000 gallons per year, it

did not definitely rule out its involvement in such projects. Moreover, one of the principals of GPC suggested that small plants might be cost effective if factors such as availability of raw materials and local demand for the product were favorable.

Also tending to refute GPC's claim that small plants were outside the scope of the joint venture was the fact that GPC was directly involved in similar-sized plants in Hydro, Oklahoma, and Houldrege, Nebraska, at about the same time as the Farm–Fuel contract was made. The prospectus for one of the other plants noted that GPC "may be deemed to be an affiliate of ACR."

Despite GPC's insistence that it only would become involved in small plants by "licensing back" the technology it had received from ACR, there is no evidence of such a license back in this case. Other evidence of GPC involvement in the Farm–Fuel project is found in the testimony by Farm–Fuel principals that Rob Chambers, of ACR, could not give the "final say" on contract terms but that such approval had to be obtained by GPC's attorneys.

One of the GPC documents in evidence indicated that GPC and ACR were handling small plants on a "case-by-case" basis from December 1979 to October 1980. This appeared to leave the door open for involvement in some small plants during that time.

When the evidence in support of the jury's finding is viewed in the light most favorable to the verdict, it appears that there is sufficient evidence of a joint venture in the Farm–Fuel project to sustain the verdict. The "elements" of a common undertaking, joint proprietary interest, mutual right to control, and a right to share the profits are clearly shown. (GPC has not seriously challenged the evidence as it pertains to a common undertaking.) A joint proprietary interest, we believe, was shown in the parties' respective ownership and contribution of technology, know-how, and patent rights. As to the mutual right to control, it could be argued that the "licensing" agreement left the issue in doubt, but the evidence supports the finding that both parties retained some right to control the efforts of the enterprise.

█ A right to share in the profits is clearly shown by the agreement to share any royalty payments received from potential marketers. GPC contends that there was no agreement with ACR to share any losses, therefore there could be no finding of a joint venture. Even assuming that an agreement to share losses is required in every case, it may be implied from an agreement for a sharing of capital and profits. *See Smith, Landeryou & Co. v. Hollingsworth*, 218 Iowa 920, 934–35, 251 N.W. 749, 752 (1933) (partnership).

In summary, we believe substantial evidence supported a finding of a joint venture as to the Farm–Fuel project. While there is also strong evidence to support a conclusion that this project was beyond the scope of any joint venture, that is not the issue.

II. *Breach of Warranty.*

The Farm–Fuel/ACR contract provided that ACR's services, as "licensor," shall include, but not be limited to:

(a) The preparation of a comprehensive design package which includes schematic layouts, sketches, design criteria, drawings and other details for a plant to produce ethyl alcohol containing not more than 0.5% water or less if a smaller percent is determined to be necessary by the National Gasohol Commission. The Project will meet the following specifications:

(i) Under normal operation, the energy input requirement in the form of latent heat and steam at boiler will not exceed 36,000 BTU per gallon of ethyl alcohol produced.

(ii) The facility built according to the design will not require for normal operation more than three (3) equipment operators.

(iii) A facility built according to the design can concentrate the thin stillage to approximately 25% solids and the thick stillage to approximately 30% solids without requiring more thermal energy input than that given by specification (i).

(iv) The facility built according to the design will be able to use a hydrocarbon mixture similar to regular grade gasoline to break the azeotrope of ethanol and water, and that all of the hydrocarbon mixture so used appear in the final product.

(v) LICENSOR will demonstrate that the Project will have the minimum ethanol production capability of 191,000 gallons monthly based on No. 2 yellow corn.

■ GPC challenges the jury's finding of a breach of warranty on two grounds: First, the Farm–Fuel/ACR contract provisions quoted above did not amount to a warranty; and, second, the evidence of a breach of any warranty was insufficient. Farm–Fuel responds that, if the legal effect of this language was one of law for the court, GPC should have asked for such a ruling. It did not, so it cannot assert it as a matter of law now. In other words, GPC allowed it to be decided by the jury, and it must now live with the jury's finding. We agree.

■ The issue remains whether the evidence was sufficient to support the finding. We believe it was. GPC's own president testified that this language was "in the form of a performance guarantee." On the question of breach, the evidence was in conflict. GPC's witnesses blamed factors other than ACR's design, including a fire and an ice storm. Farm–Fuel's experts, on the other hand, testified that the plant was incapable of producing 191,000 gallons per month and that it required more than the 36,000 BTU's per gallon as "warranted" by the agreement. One witness testified that the plant, as it was constructed and designed, would lose money on every gallon produced.

### III. *The Jury Instructions.*

■ A. GPC complains about the court's instruction number twenty-five, which stated:

[A] joint venture may arise if the parties, in the conduct of their affairs, actually place themselves in such a position as permits the relationship to be inferred, and if, from the facts and circumstances of the particular case, it appears that there was at least an implied intention to create a joint venture relationship, the relationship may be found to exist, notwithstanding a denial by an alleged joint venturer, and whether or not the parties expressly understood it to be a joint venture.

GPC's objection is that this instruction "inject[ed] the unprecedented notion, neither pled nor requested by the plaintiff, that a party could be found vicariously liable [for acts] of another based solely on what outside observers interpret the relationship to be."

When instruction twenty-five is read as a whole, we believe it merely states the general rule that a joint venture may be established by implication. *See, e.g., Pay–N–Taket, Inc.,* 259 Iowa at 724, 145 N.W.2d at 625; *Goss v. Lanin,* 170 Iowa 57, 64–65, 152 N.W. 43, 46 (1915); 46 Am.Jur.2d *Joint Venture* §§ 8, 9, at 30–31 (1969); 48A C.J. S. *Joint Venture* § 10, at 408 (1981).

This instruction correctly informed the jury that, to find a joint venture based on implication, more than an inference was required; it must also be shown that there was "at least an implied intention" to create a joint venture.

■ B. GPC has another objection to instruction twenty-five: it informed the jury that one of the requirements for a joint venture is an agreement "that the profits *or* losses from the project would be shared." (Emphasis added.) GPC argues that there must be an agreement to share profits *and* losses and that there was no evidence of an agreement to share losses. Therefore, there could be no joint venture.

Farm–Fuel responds that GPC failed to object to this instruction at trial, and it appears that this is so. We reject this argument in any event. While an agreement to share losses would strengthen a finding of joint venture, we do not believe it is necessarily required if there are other sufficient indicia of a joint venture to support a finding that it existed. Moreover, as we have already noted, an agreement to share losses may be inferred. *See Smith,*

*Landeryou & Co. v. Hollingsworth,* 218 Iowa at 234–35, 251 N.W. at 752.

Failure to instruct that an express agreement to share losses is a requirement for a joint venture would not be fatal, in our view, when it is obvious from the instructions as a whole that an agreement to share in the fortunes, whether good or bad, of an enterprise may be an indication of a joint venture. We believe that is the case here.

■ C. In a special verdict form, the question was asked of the jury whether ACR and GPC had a joint venture on August 21, 1980, without limiting it to the Farm–Fuel project. GPC argues that a finding by the jury that a joint venture existed on that date is not the equivalent of a finding that there was a joint venture with regard to Farm–Fuel on that date. It argues that this instruction allowed the jury to find GPC vicariously liable based on a general joint venture between GPC and ACR. Farm–Fuel counters that GPC made no objection to this verdict form at trial and therefore waived it. *See* Iowa R.Civ.P. 196.

We believe the objection was waived, but, in any event, the instructions when taken as a whole make it clear that the joint venture was required to be with regard to the Farm–Fuel plant. First, the special verdict question itself refers specifically to the date of the Farm–Fuel/ACR contract, August 21, 1980. Also, the instruction provided in part that the joint venture required to be established "concern[ed] the sale of technology and rendering of engineering services for Farm–Fuel alcohol plant in Storm Lake, Iowa."

■ D. GPC argues that the jury was given no guidance on the concept of proximate cause in instruction twenty-three, which stated:

You are instructed that the measure of damages in this case is such amount as may reasonably be considered as arising naturally from the breach of warranty itself or the representations made, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time the warranty was expressed or the representations made, as the probable result of such actions.

You are further instructed that damages, to be recoverable, must be direct and certain. Contingent, remote or speculative damages will not be allowed.

GPC asserts that Uniform Jury Instruction 2.6, defining proximate cause should have been given in connection with instruction twenty-three. Farm–Fuel responds that instruction forty-seven did explain the concept of proximate cause.

While instruction twenty-three does not mention proximate cause, as such, it does require that damages must be shown to be "direct and certain." Also, instruction thirty sets forth the requirements necessary for recovery, including a finding that "[t]he breach of express warranty was a proximate cause of damage to Plaintiff." Instruction forty-seven then defined proximate cause in substantially the same language as Uniform Instruction 2.6.

We believe the instructions, when taken as a whole, made it clear that proximate cause as defined in Uniform Instruction 2.6 was required.

■ E. The court instructed the jury that it could allow recovery for Farm–Fuel's "lost equity" in the plant and fixtures and for its net operating losses for the years involved. The jury returned verdicts on both elements. GPC complains that there was insufficient evidence on both the lost equity and net operating loss elements. As to the lost equity element, GPC contends that the court erred in failing to advise the jury that credit must be given for salvage value of the plant. We summarily reject the sufficiency of the evidence issue; there was abundant evidence from which the jury could have concluded these elements of damage were caused by ACR. On the matter of the court's failure to instruct on salvage value on the element of lost equity, GPC did not object to the failure of the instructions or special verdict form to provide for salvage credit. It therefore waived its right to object on appeal. *See* Iowa R.Civ.P. 196.

## IV. *Evidence Rulings.*

█ A. GPC claims error in the court's rulings on several hearsay objections to testimony seeking to elicit information on the alleged joint venture between GPC and ACR. We agree with Farm–Fuel that there is considerable doubt whether these questions actually called for hearsay in view of the circumstances in which they arose. In any event, there was an abundance of other evidence on the existence of a joint venture and, while GPC contests the *scope* of its joint venture with ACR, it admits that it in fact did have a joint venture agreement with it. In view of these facts, we do not believe the admission of evidence pertaining to the existence of the joint venture could have affected a "substantial right" of GPC. *See* Iowa R.Evid. 103(a).

█ B. GPC also claims error in admitting exhibit 126, a letter from a principal of Farm–Fuel to GPC, which stated, in part:

> I am writing in an attempt to find a workable solution to avoid further court action in relation to our ethanol processing plant in Storm Lake, Iowa.

GPC's objection to this letter is that it violates Iowa Rule of Evidence 408 which prohibits introduction of offers of compromise or settlement.

The language quoted above, however, is only a part of the letter. The letter (which was sent to GPC after the suit was filed) was mainly a recap of the events, beginning in April 1979, which had led to the building of the plant and a summary of the problems which followed. Although the language quoted above could be construed as an offer to settle, it does not say so. It sought only a "workable solution" to the problems, which could include a myriad of possibilities. Of course, this statement could not be construed as an admission of liability, as we find in most settlement offers, because it was sent by the plaintiff—not the defendant.

We do not believe it was error to admit the letter into evidence. (Other portions of the letter, which contained objectionable information, were ordered stricken from the copy submitted to the jury.)

█ C. GPC also complains of trial court rulings which admitted opinions by Farm–Fuel witnesses regarding the existence of a joint venture but denying testimony by a witness for GPC which tended to refute that conclusion.

Principals of Farm–Fuel were allowed to testify that they believed they were actually negotiating a contract with GPC when they discussed the Farm–Fuel plant with ACR and that they believed ACR and GPC were "one and the same." GPC argues that this amounted to a legal opinion on the existence of a joint venture and the witnesses were not qualified to give such an opinion.

Farm–Fuel relies on Iowa Rule of Evidence 701 to support the court's ruling admitting this evidence. Rule 701 provides for opinions by lay witnesses under some circumstances:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

We do not agree that the statements of these witnesses are legal opinions as to the existence of a joint venture, but were, rather, opinions as to the identity of the persons with whom they were dealing. This would be a matter "rationally based on the perception of the witness," thus permitted by rule 701(a). Admission of opinion evidence, lay or expert, is largely discretionary with the trial court. *Wadle v. Jones,* 312 N.W.2d 510, 515 (Iowa 1981); *State ex rel. Leas v. O'Neal,* 303 N.W.2d 414, 420 (Iowa 1981). The trial court did not abuse its discretion here.

█ GPC attempted to counter this evidence with testimony by its president on the lack of any agreement between GPC and ACR on the Farm–Fuel project. It argues that this should have been permitted, especially in view of the fact the court

allows similar testimony by Farm–Fuel witnesses. The court refused to permit the testimony on the ground that it called for a legal opinion. While we might have permitted the witness to answer the question, it is, again, a matter of trial court discretion.

Moreover, we do not believe substantial rights of GPC were affected, Iowa R.Evid. 103(a), because a great quantity of other evidence was produced by GPC to show there was no joint venture. The jury apparently just did not accept that version. We do not believe there is any reasonable likelihood that adding another witness's testimony, even a witness of the stature of the president of the company, would have changed that.

### V. *Settlement Issue.*

█ GPC contends that Farm–Fuel represented to the court, at the eleventh hour, that it had settled with all of the original defendants except GPC. It contends that this was not true, and it apparently was not. This was prejudicial to GPC, it claims, because "[those defendants] did not attend or participate in the trial as parties. If any damages were to be awarded, the jury had no choice but to award them against GPC." GPC and the court apparently did not learn until after the close of the evidence that, in fact, the settlement had not yet finalized. (It was finalized, however, at a later date.)

It appears that Farm–Fuel did in fact overstate the case with respect to the state of its settlement negotiations. How GPC was actually prejudiced, however, is not apparent. The jury was instructed that other parties had been involved. The verdict forms on the negligence counts (on which the jury awarded no damages) informed the jury that other parties were involved and allowed for an apportionment of fault. The settlement proceeds, $75,000, were ordered by the court to be deducted from the verdict against GPC.

While the conveyance of misinformation to a court should be strongly discouraged, we do not believe there is a reasonable likelihood that GPC was prejudiced in this case. We find no error in the trial court's refusal to grant a new trial on this issue.

### VI. *The Shareholders' Separate Appeal.*

█ A. Beaver Valley Canning Company, Delmar A. Nelson, and Robert W. Sackett, were added as plaintiffs to Farm–Fuel's original suit. These additional plaintiffs were shareholders and/or directors of Farm–Fuel. We will refer to them collectively as the shareholders.

Approximately six weeks before trial, and after the defendants' answers had been filed, the shareholders applied for leave to amend their petition to assert a third-party beneficiary claim. The application was denied, and the shareholders appealed.

The time for amendment as a matter of right had passed because a responsive pleading had been filed. Iowa R.Civ.P. 88. Any allowance of an amendment at that time would therefore be discretionary with the trial court. *Id.; Chao v. City of Waterloo,* 346 N.W.2d 822, 825 (Iowa 1984); *Johnston v. Percy Constr. Co.,* 258 N.W.2d 366, 370 (Iowa 1977). In view of the already complex nature of the case and the lateness of the attempted amendment, we find that there was no abuse of discretion in denying it.

█ B. The district court directed a verdict against the shareholders on their claim of misrepresentation. We agree with the district court that these individual claims by the shareholders should not be allowed to be prosecuted in view of the claim for damages already pursued by the corporation itself. *Cf. Cunningham v. Kartridg Pak Co.,* 332 N.W.2d 881, 883 (Iowa 1983) (generally, shareholders have no claim for injuries to their corporation by third parties within context of derivative action).

We find no grounds for reversal on either appeal. AFFIRMED ON BOTH APPEALS.