MELVIN FORSBERG, Appellant, v. KOSS CONSTRUCTION COMPANY, Appellee; IOWA STATE HIGHWAY COMMISSION et al., Defendants; ARTHUR LANGE et al., Defendants, Cross-petitioners, and Appellants.

No. 42206.

JANUARY 9, 1934.

REHEARING DENIED OCTOBER 18, 1934.

Thomas J. Bray, for appellants Melvin Forsberg and Arthur Lange.

Carl C. Hendrickson, and Thomas J. Bray, for appellant Cities Service Oil Co.

Parrish, Cohen, Guthrie & Watters, for appellant Standard Oil Co.

Johnson & Teter, for appellants William Sarver, Geryll Lash, J. A. Ellis, H. Burton, Lewis Morris, and Lyle Washburn.

Comfort & Comfort, for appellees Koss Const. Co., C. M. Wilson, and M. O. Weaver.

C. E. Walters, for appellees Iowa State Highway Commission, Thomas A. Way, Carl C. Riepe, T. J. O'Donnell, L. T. Quirk, and W. D. Archie.

C. L. Hixon, pro se.

CLAUSSEN, C. J.—Relatively early in the year 1932 the Koss Construction Company entered into contracts with the state high-

way commission for the construction of three stretches of pavement on the primary roads in Marion county, Iowa. The Koss Construction Company entered into a contract with one E. M. Wilson, of Harvey, Iowa, by which Wilson agreed to furnish and deliver the sand and aggregate necessary for the construction of the several jobs, in stock piles at two "set ups" of the Koss Construction Company, at an agreed price per ton. Wilson entered into an agreement with one M. O. Weaver by which Weaver agreed to furnish a part of the sand and gravel for the construction of the paving jobs at an agreed price slightly lower than the prices agreed upon by Wilson and the Koss Construction Company. Weaver hired one C. L. Hixon to haul sand and gravel to the stock piles. Hixon hired plaintiff and certain of the defendants in his hauling operations and purchased gasoline and oil from the Standard Oil Company and Cities Service Oil Company for the operation of his trucks.

The record does not indicate the source from which the sand and gravel was obtained by either Weaver or Wilson, nor does it indicate from where it was hauled by Hixon. No particular significance is attached to this, and it is simply stated as the fact. The labor and gasoline and oils involved herein were admittedly used in the hauling of the sand and gravel by Hixon to the stock piles at the "set ups" of the Koss Construction Company, from which the paving jobs were constructed.

In conformity with the statutes, the state highway commission retained a percentage of the pay due the Koss Construction Company, and such retained sum is in excess of the demands involved in this suit.

Claims for such labor and gasoline and oils were filed by the laborers and oil companies in strict conformity with law, and this suit has for its object the enforcement of such claims against the retained percentages. One other matter is involved in the suit which will be noticed in the first division of the opinion.

I. Hixon was procuring gasoline from the Standard Oil Company. He was not paying invoices promptly. In August of the year 1932 the company refused further credit to Hixon. On August 19, a telephone conversation was had between Mr. Weaver and a credit man of the company. In this conversation it was agreed that the company should furnish Hixon gasoline and oils in the future which were to be charged to Weaver and paid for by Weaver. Concerning the gasoline and oil furnished from that time on there is

no dispute. Such items have been paid, but a serious dispute exists concerning what was said in relation to gasoline, etc., furnished by the company to Hixon prior to that date. The representative of the company testified that Weaver agreed to pay the balance due on such items. Weaver testifies that he agreed to pay such balance to the extent of the money due from him to Hixon. In this suit the company asks judgment against Weaver for the balance due on the Hixon account. The trial court determined the issues against the company. We must therefore determine whether Weaver agreed to pay the balance due the company on the Hixon account. It has been noted that the representative of the company testified that Weaver agreed to pay the balance of the account and that Weaver testified that he agreed to pay the balance due from him to Hixon on the account. The burden of proving the contract rests upon the company. The testimony of the participants in the conversation leaves the proof in equipoise, but the company insists that certain letters written to it and by it turn the balance in its favor. We cannot agree with the company in this contention. The letters referred to are as consistent with Mr. Weaver's version as they are with the company's version of the conversation.

The company contends that it is entitled to judgment against Weaver in any event for the balance which was due from Weaver to Hixon.

The Standard Oil Company pleaded:

"That this cross-petitioner sold and delivered to the defendant, C. L. Hixon, at the request of the said C. L. Hixon, gasoline and oils which were used in the construction of said projects in the sum of $1606.71, which account is due and unpaid and the property of this cross-petitioner. * * *

"That the materials sold by this cross-petitioner to the defendant, C. L. Hixon, were sold upon the credit of C. L. Hixon at the beginning of the said construction program.

"That on or about the 18th day of August, 1932, this cross-petitioner notified the defendant, C. L. Hixon and the defendant, M. O. Weaver, that it would not furnish any more materials to the defendant, C. L. Hixon until the back account was paid. That the defendant, M. O. Weaver, orally agreed at that time that if they would continue to sell material to the defendant, C. L. Hixon that. he, M. O. Weaver, would pay the back account and all future accounts sold by the cross-petitioner to the defendant, C. L. Hixon

and used in connection with these projects. That in pursuance thereto, this cross-petitioner continued to furnish to the said C. L. Hixon goods, wares and merchandise, but that the said defendant, M. O. Weaver, has failed and refused to pay the account of this cross-petitioner."

Weaver testified that, in the telephone conversation with the company's representative, he agreed to pay the balance due from him to Hixon on Hixon's past-due account to the company. All of the parties, other than the oil company, stipulated that, if named individuals, who were in a position to know the facts, would testify, their testimony would be that nothing was due from Weaver to Hixon. But, on account of the fact that the company is not a party to this stipulation, it cannot be considered in the determination of the company's rights. The company introduced in evidence a letter which reads as follows:

"Iowa Falls, Iowa, Nov. 4, 1932.
"Standard Oil Co. Des Moines, Iowa.
"Gentlemen: Enclosed please find check for $1,404.79 covering the C. L. Hixon account as charged to me. For August and September.
"Regarding the balance of the C. L. Hixon account of $1,749.73. As his account now stands with me he has a credit of nearly $1,000.00, however this amount is subject to change pending corrections and final settlement.
"Very truly yours,
"M. O. Weaver,
"By H. F. Chance."

The company now contends that under Weaver's testimony and the letter above referred to it is entitled to judgment against Weaver for $1,000. Conceding, but not deciding, that the letter is sufficient to put Weaver in a position where he had the burden of going on with the evidence and that in the absence of other evidence we would be warranted in finding that $1,000 was due from Weaver to Hixon, we cannot sustain the contention of the company that it is entitled to judgment against Weaver for $1,000. The agreement which is pleaded is materially different from the one upon which it now relies. The issue tendered by the pleading was in relation to a contract to pay the entire Hixon account with the company. It suggests nothing in relation to the condition of the account be-

tween Hixon and Weaver. If the issue pleaded had involved the condition of the account between Hixon and Weaver, it might well be that Weaver would have taken up the burden of going on with the evidence and established that nothing was due from him to Hixon. But, upon the issue of an agreement on Weaver's part to pay the entire Hixon account, it was entirely immaterial whether Weaver did or did not owe Hixon any balance, for the pleaded promise to pay was in no wise contingent upon the existence of a balance due Hixon. In the condition of the pleadings, there was no occasion for Weaver to go on with the evidence as to whether anything was due from him to Hixon. In Smith, Landeryou & Co. et al. v. Hollingsworth, 218 Iowa 920, 251 N. W. 749, Mr. Justice Donegan said of a similar situation:

"Unless this question was raised by the pleadings and was before the trial court, it cannot be considered here, because the appellee should not be subjected to a liability concerning which there was no issue in the trial court and in regard to which there was no reason why he should introduce any evidence."

The contract pleaded by the company is not established by the evidence, and consequently the company cannot recover against Weaver.

II. The trial court refused to establish the claims for labor and gasoline and oils against the retained percentages.

Code, section 10305, provides:

"Claims for material or labor. Any person, firm, or corporation who has, under a contract with the principal contractor or with subcontractors, performed labor, or furnished material, service, or transportation, in the construction of a public improvement, may file, with the officer, board or commission authorized by law to let contracts for such improvement, an itemized, sworn, written statement of the claim for such labor, or material, service, or transportation."

The contention of appellants is that the labor and gasoline and oils were furnished to a subcontractor in the construction of the pavement, and hence appellants have the right to file claims for their respective demands and to enforce payment against the retained percentages under other provisions of chapter 452 of the Code.

In a sense, every person who contributes in labor or material to the process by which materials are manufactured, transported, and ultimately used in the construction of a pavement, is either a contractor or a subcontractor, for in some form or other the relationship of every such person is based upon a contract to which he is a party. The material transported by claimants was sand and gravel. But for the purpose of discussion we will allude to cement because it has a little longer history than sand and gravel, and it will avoid the suspicion that we have gone beyond the record for information as to the source of the sand and gravel used in the paving. The coal miner who digs coal used in the manufacture of cement has a contract under which he works exactly the same as the quarryman who excavates the shale from which the cement is made, or the mechanics who operate the grinding and roasting processes through which the raw materials are converted into cement. The cement is purchased and transported to the location of the pavement, and there it becomes a part of the improvement. Every step in the long process has been taken under a contract. It is obvious that under usual circumstances the miner who digs the coal, perhaps in Kentucky, cannot have the right to file a claim against the retained percentages on the pavement job, even though he were able to show that the coal dug by him was used in roasting the cement actually mixed in the concrete of the paving, not because he lives in Kentucky while the paving is in Iowa, but on account of the fact that his relationship is too remote to fall within the meaning of section 10305 of the Code. From the time he dug the coal from the earth until the cement was put in the paved road there is an unbroken line of contracts. In some sense and in some degree he has labored for a subcontractor, and yet no one would contend that he is entitled to file a claim under the statute. Assuming that the cement was sold to the Koss Construction Company by a jobber on cars at some station in Marion county, it is obvious that the jobber could file a claim for the cement, for he has furnished material under contract with the contractor, but can the railroad company which transported the cement from the cement plant for the jobber, or the cement company, file claims for the freight and the cement? Can the man who ground the cement and the one who sacked it file claims for their wages? The jobber contracted with the Koss Construction Company, and hence is in a sense a subcontractor. The cement company contracted with the jobber, and is in

the same sense a subcontractor. The railroad company has a contract, and so has the grinder and the sacker. Without these men and agencies the pavement could not be built, and yet assuredly they may not all file claims. The answer to this question where the right to file claims ends is obvious if the statute is carefully read.

One who furnishes material under contract with the principal contractor may file a claim for the price of such material. One who performs labor under contract with the principal contractor may file a claim for his wages. But the employee of one who furnishes material to the principal contractor has no contract with the principal contractor and performs no labor for him. His contract of employment is with the one who furnishes the material, and his labor is performed for the materialman. He may not file a claim for his wages because his labor was not performed under contract with the principal contractor. It seems clear, under the statute, that demands for labor and materials entering into the production and transportation of material furnished to the principal contractor, up to the time it is delivered, may not be filed as claims under the statute, for the requirement of the statute is that the material must be furnished and the labor performed under contract *with* the principal contractor.

We are not unmindful of the fact that under the statute one who furnishes material or performs labor under contract with a subcontractor in the construction of a public improvement may file a claim. The relationship between the principal contractor and the materialman is contractual, but the fact that the contractor has a contract with the materialman does not make the materialman a subcontractor. The laborer who works on the job with a shovel has a contract with the contractor under which he performs a part of the work, as indispensable to its completion as the furnishing of material, yet no one would contend for a moment that he is a subcontractor.

Webster's Dictionary defines "subcontractor" as "One who contracts with a contractor to perform part or all of the latter's contract."

The Koss Construction Company agreed:

"To construct in accordance with the plans and specifications therefor, and in the locations designated in the notice to contractors, the various items of road work awarded said party of the second

part on March 1, 1932, as follows:" (Then follows a description of the work awarded.)

It was necessary for the Koss Construction Company to procure sand and gravel to complete the work, but we do not believe that one who agrees to furnish material contracts with the principal contractor to perform all or a part of the latter's contract or becomes a subcontractor. The case before us has the element in it that the sand and gravel was purchased from Wilson in stock piles at the "set ups". The thought naturally occurs that the material had to be moved to the stock piles at the "set ups" before the road could be built. But that fact is no more controlling than is the fact that the gravel had to be dug out of some pit, and cement made in some plant before either could be delivered to the contractor for use in the pavement. The contractor had the right to contract for delivery at any place agreeable to it and the materialman. If the gravel and sand had been delivered to the Koss Construction Company at a distance from its stock piles at its "set ups" the company would have been obliged to haul it. We have no doubt but what one engaged in hauling the gravel under such circumstances could file a claim for his wages, for in that event he would be working under a contract either with the principal contractor or a subcontractor, depending, of course, upon whether the hauling was done by the company or by some concern for it. We concede that the distinction between the purchase of sand and gravel at a pit or railroad station and its purchase in stock piles on the job is perhaps close. In either event the gravel must be transported from the pit or station to the stock piles. In the one event, the cost of transportation becomes a part of the price paid for the gravel, while, in the other, it is borne by the contractor in some other form. It may seem strange that the wages should be susceptible of enforcement against retained percentages in the one instance and not in the other. But we think the legislature has clearly drawn the line of demarcation in its requirement that the labor must be performed under contract with the principal contractor or a subcontractor to make the claim for wages enforceable against the retained percentages.

In any event such considerations are not controlling of the question that must be answered in this case, namely, whether Hixon who agreed to haul sand and gravel for Weaver, who was under contract with Wilson, who in turn was under contract with the Koss

Construction Company to sell gravel and sand at the stock piles, was a subcontractor in such a sense that the men who drove his trucks and the companies that sold him gasoline and oil may file claims for their wages and merchandise against the retained percentages. We are not disposed to consider the question whether a subcontractor of a subcontractor of a subcontractor is a subcontractor within the meaning of chapter 452 of the Code. The decisions of the courts of other states under the statutes of the various forums are not in harmony. See 40 C. J. p. 141, section 155, where the cases pro and con are collected; and see Utter v. Crane, 37 Iowa 631. As we view the situation, Wilson was not a subcontractor. In Rainbo Oil Co. v. McCarthy Improvement Co., 212 Iowa 1186, 236 N. W. 46, the oil company sought to establish its claim for gasoline and oils furnished to one Peacock, who was a "batch hauler" under contract with the McCarthy Improvement Company on a paving project, against retained percentages. It appears that a part of the gasoline furnished to Peacock was sold by him to other subcontractors on the same job. As to the gasoline thus disposed of, the oil company furnished the gasoline to one who in turn supplied it to a subcontractor who used it up on the paving work. While the situation is not exactly the same as in the case at bar, the principles underlying it are controlling, for the question is whether the intervention of one in the role of materialman so breaks the sequence of contracts that claims more remote than the materialman's cannot be filed. In that case this court said:

"It is also shown that a considerable quantity of the products thus supplied by the plaintiff company to Peacock was sold by him to other subcontractors on orders which the appellant company gave to said subcontractors, who, upon receiving the order, purchased the gasoline from Peacock, and these orders were presented by Peacock to the appellant company, and he received his money for the products sold, and the amount thereof was deducted from the amount due from the contractor to the subcontractor who received the material from Peacock. It is thus shown that, for the amount disposed of by Peacock in this manner, he was not a subcontractor, but himself became a materialman."

The Rainbo case does not turn solely upon this proposition, for it also appears in that case that part of the gas and oil furnished by the oil company to Peacock was sold to the public and a part

used for purposes connected in no way with the construction of the paving. But the case is authority for the proposition that a materialman is not a subcontractor within the meaning of chapter 452 of the Code. Rights of the kind under consideration were unknown to the common law and are of purely statutory origin. Decisions in other jurisdictions are based on the laws of the local jurisdictions which vary greatly. With such qualification it may be said that our conclusion is in accord with the holdings of the courts of other states. In Hightower v. Bailey, 108 Ky. 198, 56 S. W. 147, 49 L. R. A. 255, 94 Am. St. Rep. 350, the court says:

"But the averments of the pleading do not show that Clark was a subcontractor, but do show that he was merely a materialman, under contract with the contractors, Bailey & Koerner, to furnish certain lumber for the elevator. Clark and Hightower were both materialmen, but the statute does not give a lien to a materialman, who furnishes materials to another materialman. The materials for which the statute gives a lien are those which are furnished to an owner, a contractor, subcontractor, architect, or authorized agent. We cannot extend the statute beyond its plain language and evident meaning."

Hinckley v. Field's Biscuit & Cracker Co., 91 Cal. 136, 27 P. 594; Wood v. Isgrigg Lumber Co., 71 Ind. App. 64, 123 N. E. 702; Pacific Rolling-Mills Co. v. James Street Const. Co. (C. C. A.) 68 F. 966; Merriman v. Jones, 43 Minn. 29, 44 N. W. 526; Fisher v. Tomlinson, 40 Or. 111, 60 P. 390, 66 P. 696; Matzinger v. Harvard Lumber Co., 115 Ohio St. 555, 155 N. E. 131. See, also, 40 C. J. p. 130, section 142 et seq., where many authorities are collected.

We have been referred to no case holding to the contrary, and diligent search on our part has failed to reveal such authority.

The labor and merchandise were furnished to one who had no contract with either the contractor or a subcontractor, and consequently cannot be collected out of the retained percentages.

We reach the conclusion that the decree of the trial court is correct, and it is in all respects affirmed.—Affirmed.

STEVENS, KINDIG, ALBERT, and DONEGAN, JJ., concur.